# CHARLESTON.

WEIGAND *et al. v.* ALLIANCE SUPPLY CO. *et al.*

44 133
44 365

44 133
47 289
47 754

44 133
62 63

Submitted January 19, 1897—Decided November 27, 1897.

1. CORPORATIONS—*Dissolution—Assets.*

    A corporation is not dissolved by the fact that it has lost or conveyed all its assets away; and, notwithstanding such fact, not less than one-third in interest of the stockholders of such corporation have a right, under section 57, chapter 53, Code 1891, to file their bill in equity, showing sufficient cause for dissolution thereof, (p. 148).

2. CORPORATIONS—*Trustee—Special Receiver.*

    A case in which it is *held* to be proper to appoint the trustee under general assignment to be special receiver. (p. 149).

3. INSOLVENCY.

    "A person is insolvent, within the meaning of section 2, chapter 74, Code 1891, when all his property is not sufficient to pay all his debts." *Wolf* v. *McGugin,* 37 W. Va., 552, Syl. point 1. (p. 156).

4. STENOGRAPHERS—*Court's Authority—Commissioners.*

    Neither the circuit courts nor the judges thereof are authorized, under the statute providing for the employment of shorthand reporters in said courts, to employ or authorize the employment of said reporters before commissioners in executing the orders or decrees of reference of such courts. (p. 159).

5. COMMISSIONER'S REPORT—*Fees of Commissioner—Certificate.*

    Where a report of a commissioner, under an order or decree of reference is returned, it is the duty of the court, when called to its attention, to see that the certificate under oath, of the fees and time employed of the commissioner, as required by section 5, chapter 137, is annexed thereto, and that no fees be allowed or paid thereon until such certificate is made. (p. 159).

6. COMMISSIONER—*Counsel Fees—Trust Funds.*
    Syllabus, point 15, *Crumlish's Adm'r* v. *Railroad Co.*, 40 W. Va., 627, approved. (p. 161).

7. RECEIVERS—*Trustees—Extra Allowances.*
    Extra allowances to trustees and receivers should not be made in the absence of evidence of extraordinary services rendering such allowances just and reasonable. (p. 161).

8. ATTORNEY'S FEES—*Fund—Attorney's Lien.*
    Where a fund is brought into a court of equity through the services of an attorney, who looks to that alone for his compensation, although his interest cannot technically be called a "lien," he is regarded as the equitable owner of the fund, to the extent of the reasonable value of his services; and the court administering the fund will intervene for his protection, and award him a reasonable compensation, to be paid out of it. (p. 161).

Appeal from Circuit Court, Mason County.

Bill by Adam Weigand and others against the Alliance Supply Company, a corporation, and others, for appointment of a receiver. From a decree appointing a receiver, and from orders refusing petitioners to be made parties, certain of defendants appeal.

*Reversed.*

JOHN L. WHITTEN and TOMLINSON & WILEY, for appellants.

CHAS. E. HOGG and J. S. SPENCER, for appellees.

McWHORTER, JUDGE:

At March rules, 1895, of Mason County Circuit Court, Adam Weigand, C. T. Blessing, David Roush, S. J. Grimm, W. A. Carson, F. E. Gill, G. M. Nease, J. P. Hurlow, F. M. Gill, William Thomas, John Black, H. N. Rollins, W. R. Gill, J. B. Canter, J. E. Snyder, Alonzo Carsey, W. H. Carpenter, Hugh Daugherty, and J. M. Grimm filed their bill in chancery against the Alliance Supply Company, a corporation, E. J. Summerville, trustee, C. E. F. Sayre, and others, alleging that said supply company was incorporated under the laws of this State, the 2d day of December, 1891, for the purpose of carrying on a general merchandise business at Letart, in Mason county; that, in addition to the number of shares subscribed for and held by the corporators (whose names are mentioned

as defendants), there had been sales of additional shares from time to time, for the purpose of increasing the capital stock, and that the number of outstanding shares at that time was about three hundred and thirty, and that there had been paid into the treasury, on account of subscriptions and sales, about the sum of one thousand four hundred dollars, leaving about the sum of two hundred and fifty dollars still due and unpaid on account of said subscriptions and sales; that plaintiffs together held and were the owners of more than one-third .of all the stock of said company subscribed and sold; that on the 23d day of December, 1891, the corporation purchased a lot from H. N. Rollins and wife, in the town of Letart, and erected a store-house and other houses suitable for the purpose of carrying on their said business, at a cost of .about one thousand two hundred dollars, and purchased and placed in said storehouse a stock of goods for the purpose aforesaid; that on the 28th day of June, 1892, the said corporation, in order to obtain additional capital with which to carry on its business, made and executed a note for one thousand three hundred dollars, in favor of S. J. Grimm, David Roush, and A. Weigand, and on the 15th day of January, 1893, made and executed its note for three hundred and fifty dollars in favor of David Roush, and by means of said notes obtained and used in its said business the said sums of one thousand three hundred dollars and three hundred and fifty dollars, respectively; that, at the time of the execution of said notes, it was understood and agreed by and between the said corporation and the said S. J. Grimm, David Roush, and A. Weigand that the said notes should be secured at once by a deed of trust upon the company's said real estate, and exhibited said notes with the bill; that notwithstanding the said agreement and understanding, and also notwithstanding several resolutions of the stockholders of said corporation in general meeting assembled, ordering and directing the execution of said deed of trust for the purpose aforesaid, the said corporation failed and neglected to execute the same for a long space of time; but that on the last day of September, 1893, the said board of directors of said corporation, and on the 9th day of November, 1893, the president and sec-

retary thereof, respectively, executed two several deeds of trust securing both of said notes, in compliance with the original understanding and agreement, as aforesaid, (both of said deeds were exhibited with the bill); that on the 6th day of December, 1893, the board of directors of said corporation then in office adopted a resolution directing the execution of another deed of trust for the purpose of securing said notes, and also directing the assignment of certain notes and accounts to the said S. J. Grimm, David Roush, and A. Weigand, and to the said David Roush, as additional collateral security for the payment of said two several notes, a copy of which resolution was exhibited with the bill; that on the 8th day of December, 1893, in pursuance of the resolution last mentioned, the said Alliance Supply Company made and executed a deed of trust to J. S. Spencer, trustee, upon the real estate of said corporation, to secure to said S. J. Grimm, David Roush, and A. Weigand, and to said David Roush, the payment of said notes, which deed of trust was exhibited; that on the 13th day of December, 1893, the said board of directors of said corporation adopted a resolution, reciting, among other things, the following:

"Whereas, it appears to the satisfaction of the board of directors of this company that, owing to the embarrassed financial condition of this company, its business cannot be further carried on except at a constant loss; and whereas, in the opinion of this board, it is to the interest of this company and to the creditors thereof that all its property and assets, real and personal, be conveyed to a trustee for the benefit of all its creditors,"—and directed the president and secretary of said company to make, execute, seal, and acknowledge, and deliver for record, a deed of trust to E. J. Summerville, trustee, upon all the real estate of the company, and all their goods, wares, and merchandise, and store furniture and fixtures, and all bonds, notes, accounts, claims, and demands then due and owing, or thereafter to become due and owing to said company, for the purpose aforesaid, all of which, with many other provisions in said resolution contained, will more fully appear from the copy of the same, exhibited with the bill. The bill further alleged that, in compliance with said resolution, the

president and secretary, for and on behalf of the said company, on the 13th of December, 1893, made and executed the said trust deed; that all of said deeds were duly recorded in the clerk's office of the county court of Mason county; that the said trustee, Summerville, took possession of the property conveyed by said trust deed, in accordance with the terms and provisions thereof, on the ————day of December, 1893; that, for a long time prior to the execution of said deed of trust to Summerville, the said corporation, through its officers and agents, had endeavored to increase the amount of its capital stock by sales of additional shares, and had endeavored in other ways to make some arrangements whereby the business of said corporation could be continued as contemplated by its organization, but were unable to make any arrangement that would warrant the further continuance of their said business; that a general meeting of the stockholders of said corporation was called on the 8th day of December, 1893, to meet on January 3, 1894, which meeting was for the purpose of devising some means whereby the business of said corporation might be continued; that, before said meeting was held, the action of some of the creditors of the corporation necessitated the said trust deed to E. J. Summerville in order to prevent a sacrifice of its property; that the stockholders met in general meeting, pursuant to to the notice, at which meeting there was a large majority of the stock of said corporation present; and that the stockholders at the said meeting ratified, approved and confirmed the action of the board of directors in the several matters before recited, to wit, the assignment of certain notes and accounts of the company to said S. J. Grimm, David Roush, and A. Weigand, and to said David Roush, as collateral security, in addition to the deed of trust aforesaid for the payment of said several notes in favor of said parties, and in the execution of the said deeds of trust to J. S. Spencer, trustee, and E. J. Summerville, trustee, respectively; that said stockholders' meeting adjourned without making any arrangement or provision whatever for the further continuance of the business of said corporation, and that no arrangements or provisions have since been made by the corporation or any one for it

for the further operation of its business; that the said corporation had contracted debts in the prosecution of its said business which it was unable to pay; that said debts were largely in excess of its assets, and that said corporation was, as plaintiffs believed, wholly and totally insolvent; that said E. J. Summerville, trustee, had sold all the personal property of said corporation as directed by the deed of trust to him, and had in his hands the proceeds of sale; that the real estate of said corporation had not been sold under any of the deeds of trust aforesaid, because, as plaintiffs believed, the amounts due upon the notes secured thereby had not been ascertained, and that said amounts could not be ascertained without an accounting between the said corporation and the said Grimm, Roush, and Weigand, and Roush, as to the credits that should be · properly applied to the payment of said notes by reason of the assignment of the said notes and accounts to the said parties as collateral security, as aforesaid, as some of said notes and accounts had been collected by the said parties, the amount whereof was not known, and that a considerable number of them were of no value; that pending the determination of the amount due upon the said notes, it was to the interest of the creditors and stockholders of said corporation that the real estate should be rented out, and the proceeds of the renting collected and applied to the payment of the debts of the said corporation, and that the real estate should be taken care of and preserved during the pendency of said determination; that plaintiffs were advised that there were some unliquidated and unadjudged claims and demands due and owing said corporation by reason of breaches and forfeitures in the conditions of several bonds taken by the said corporation from some of its officers and agents for the faithful performance of their duties by such officers and agents; that said corporation had entirely abandoned its corporate business, and that there was no one who was authorized to take charge of and preserve their said real estate from loss and destruction; that the said Summerville, trustee, was not able to make a proper distribution of the funds in his hands until the amount due upon the notes was ascertained and determined, and the amounts due the several

creditors of the corporation were also ascertained and determined; that it would therefore be to the best interests of the creditors and stockholders of the corporation to have a receiver appointed in the cause to take charge of and administer all its assets, and that the said E. J. Summerville, trustee, should turn over to such receiver all funds, in his hands as such trustee, and the receiver should thereafter take charge of and administer the same, as well as all other assets that might come into his hands as such receiver in lieu and in place of the said E. J. Summerville, trustee; and alleging that it would be greatly to the interest of all parties concerned or interested in the assets of the corporation that said Summerville should be appointed as such receiver, and that his compensation as such receiver should be determined by services rendered as such receiver, and should in no wise interfere with or conflict with the compensation to which he was already entitled as such trustee; that plaintiffs constituted more than one-third in interest of the stockholders of said corporation, and in view of the facts recited, they desired to wind up the affairs of the said corporation, and have the same dissolved. The bill prayed that Summerville should be appointed receiver, take charge of the assets of the corporation, the cause be referred to a commissioner of the court to convene the creditors, to take, state, and report an account showing the assets and indebtedness thereof, the liens, if any, and their priorities, on the real estate, and to whom due, and to ascertain and determine the amounts respectively due to each of the creditors of the said corporation, and to settle the accounts of Summerville, trustee; and that, upon the incoming of the report of said commissioner, the property shown by said report to be on hand and unsold should be sold, and the proceeds applied to the payment of the costs attending the suit, and including the compensation of said Summerville as trustee and receiver, and the debts ascertained by said commissioner, and the surplus, if any remaining, to be paid to the stockholders of the said corporation, according to their respective interests; and that said corporation be dissolved; and for general relief.

On the 18th of May, 1894, Slingluff, Johns & Co. tendered their petition in the cause, asking to be made parties defendant therein, and that the petition might be treated as an answer to the bill in case the court overruled the demurrer that they filed to the bill. Plaintiffs objected to the filing of the petition. The objection was overruled, and the petition filed. The said petitioners demurred to plaintiffs' bill, which demurrer was also overruled, and petitioners given leave to file their answer on or before the 2d day of June, 1894, and the plaintiffs were given leave to file a special reply in writing by the same date. Slingluff, Johns & Co. filed their answer, averring that it may be true that plaintiffs were stockholders of the Alliance Supply Company, and that said suit was brought for the purpose of dissolving the corporation, and for the purpose of ascertaining the indebtedness; that they were informed and believed that the plaintiffs Adam Weigand, S. J. Grimm, and David Roush, together with other of the plaintiffs who were stockholders and members of the board of directors of said Alliance Supply Company, well knowing the insolvency of said company, attempting to prefer the plaintiffs Weigand, Roush, and Grimm in a debt they claimed was due said parties, by executing a trust deed, a copy of which was filed with the bill, well knowing at the time that said Alliance Supply Company was wholly and totally insolvent, and then and there authorized and permitted the officers and its agents to purchase from respondents goods, wares, and merchandise to the amount of three hundred and twenty-six dollars and ninety-three cents, which were shipped, sold, and delivered to said company at the instance and request of the duly-authorized agents of said supply company, who then knew that it was wholly insolvent, and the respondents were not aware at the time of the insolvency of said company; that they sold said goods in good faith; that the said company received them at the price and sum of three hundred and twenty-six dollars and ninety-three cents, and refused to pay for the same, or any part thereof, and still refused to do so. Although they well knew that the said company was largely indebted to various persons besides these respondents more than the personal and real estate belonging to said company,—and

filed with their answer an itemized bill; and averring that the trust deeds made by the said Alliance Supply Company by the said board of directors to the said Weigand, Roush, and Grimm, the stockholders of said company and members of the board of directors, were fraudulent and void; that said suit was brought by the stockholders of said company more for the purpose of sustaining said deeds than to dissolve its charter, at the expense of the creditors of said corporation, and to take and consume the assets of said corporation at the creditors' expense; that, if the trust deed executed to Summerville is valid and binding, there is no use for a receiver of said real and personal estate; that said trustee had disposed of the personal estate under and by virtue of said trust deed, and refused to pay over any portion to these respondents or other creditors of said Alliance Supply Company; that an insolvent corporation cannot prefer its stockholders and board of direc'ors in preference to other creditors, as this company has done to the plaintiffs in this case; that a court of equity will not permit the officers of an insolvent corporation to purchase goods for the purpose of securing their own indebtedness, and never pay for the goods so purchased; and charged that the indebtedness of the Alliance Supply Company was three times as much as its real and personal property was worth, and was at the time such trust deeds were executed; that said corporation had conveyed in trust by the last trust deed all its real and personal estate, accounts, notes, bonds, claims, and demands of every kind and description to a trustee for paying its debts *pro rata*; that said stockholders plaintiff had no interest in the dissolution of said concern, and that there will be no stock or any dividends coming to said stockholders, and they knew the same at the time they instituted the suit. L. S. Delaplain & Co. filed their petition, praying to be made parties defendant, and they filed a similar answer, setting up a claim of two hundred and fifty dollars against the Alliance Supply Company. Plaintiffs filed a special replication to the answer of Slingluff, Johns & Co., as well as a general replication to all the answers.

On the 2d of June, 1894, the cause came on to be heard upon the pleadings, and the court appointed E. J. Summer-

ville special receiver, with directions to take possession and charge of all the property, of every kind and character, belonging to the corporation company, and to proceed at once to collect all outstanding claims and demands of every kind due and owing to the said company, and to bring such actions and prosecute such suits as might be deemed necessary and proper by him for that purpose, and that said trustee turn over to said receiver all moneys and property in his hands, and that the receiver loan the money in hand subject to the future order of the court, taking notes with good security. Said receiver was required to give bond in the sum of three thousand dollars. To the appointing of the receiver, defendants objected.

The cause was referred to John E. Bellar, commissioner, to take, state, and report an account showing the assets of the corporation, the value of the same, and the indebtedness, and the liens and priorities on the real estate, and in whose favor, the amounts due to each of the creditors and their priorities, if any, and to settle the accounts of the trustee, E. J. Summerville, and to report when said Alliance Supply Company became insolvent, the amount paid out by said company after it became insolvent, to whom paid, and the amount thereof, and what accounts have been assigned, to whom assigned, the amounts, and against whom they were and the date of such assignments, the accounts collected under such assignments, who holds the uncollected accounts, and to report who were the stockholders of said Alliance Company, who of them composed the board of directors of said company from the date of its insolvency to the date of the decree, and the term of office held by each of said directors, and such other pertinent and proper matters as any person in interest might in writing require, or the said commissioner deem pertinent. The commissioner filed his report under said decree of reference, ascertaining the total assets at the time of making the report at two thousand seven hundred and nineteen dollars and ninety-five cents, estimating the outstanding unpaid accounts and stock accounts at fifty cents on the dollar, and the total indebtedness of the company at four thousand five hundred and thirty-eight dollars and eighty-nine cents, and reporting the claim of Grimm,

Roush, and Weigand of one thousand two hundred and seventy-nine dollars and ten cents, and that of David Roush, amounting to one hundred and fifty-three dollars and eighty-seven cents, secured by deed of trust of September 8, 1893, as the first lien upon said real estate by virtue of said deed of trust, and also reported a settlement with E. J. Summerville as trustee, showing a net balance of cash in the hands of trustee turned over to the receiver of one thousand and thirty-five dollars and ninety-three cents. In a settlement with the trustee, the commissioner shows that, from rents received, accounts collected, and property sold, there came to his hands one thousand four hundred and forty-four dollars and fifty-seven cents, and was given credits for items amounting in all to four hundred and eight dollars and sixty-four cents, leaving one thousand and thirty-five dollars and ninety-three cents in his hands turned over to the receiver. Among the items for which he gave the trustee credit in his settlement was one for compensation to the trustee as per deed to said trustee, one hundred and fifty dollars. This was in addition to his commission on one thousand two hundred and twenty-nine dollars and eighteen cents, goods sold, under the fifth clause of the decree of reference, requiring the commissioner to report "when said Alliance Company became insolvent, the amount paid out by said company after it became insolvent, to whom paid, and the amounts thereof, what accounts have been assigned, to whom assigned, the the amounts thereof and against whom they were and the date of such assignments, the accounts collected under such assignments, who holds the uncollected accounts." The commissioner reports as follows: "In regard to this requirement, your commissioner reports it as his opinion, from all the evidence taken before him, that said Alliance Supply Company never was insolvent, unless it was on the 13th day of December, 1893, the date of the trust deed to E. J. Summerville, trustee, which said trust deed is filed with plaintiffs' bill in this cause as Exhibit J, and at this time it is not clear from the testimony that said company was insolvent, but at this time your commissioner believes it insolvent. Your commissioner therefore reports that said company did not pay out anything

'after it became insolvent.'" Here follows a list of the accounts assigned to S. J Grimm, David Roush, and A. Weigand, as collateral security for the two notes secured by the deed of trust of December 8, 1893, the assignment of said accounts dating on the 6th day of December, 1893, which is followed by a list of collections on said accounts, showing the amount of two hundred and seventeen dollars and thirty-one cents collected and applied to the note due the three, and one hundred and twenty-eight dollars and seventy-nine cents collected and applied on the small note held by David Roush, and showing the balance of said accounts so assigned as turned over to the special receiver; and reports all the indebtedness of the company as upon an equal footing as regards the personal property, and with no liens upon the personal property; and reports S. J. Grimm, David Roush, C. T. Blessing, B. F. Ridenour, and J. T. Fisher as composing the board of directors at the time the first deed of trust was made, and that S. J. Grimm, David Roush, B. F. Ridenour, C. T. Blessing, and W. A. Carson composed the board of directors after that, at the time the trust deed to J. S. Spencer, trustee, was executed; and reports J. P. Hurlow, Levi Roush, Amos Fry, and W. A. Carson as elected directors on the 16th day of January, 1894; and reported that he was not able to state whether said company was insolvent at the time of making the report or not, but, in his recapitulation, says: "Said Alliance Supply Company was insolvent on or about the 13th day of December, 1894" (evidently meaning 1893).

To this report defendants L. S. Delaplain, Son & Co. and the W. H. Smith Hardware Company excepted: "First. Because the said commissioner does not find the said Alliance Supply Company, a corporation, insolvent on the 8th day of December, 1893, at the time said corporation executed a deed of trust to J. S. Spencer, trustee, to secure David Roush, S. J. Grimm, and Adam Weigand the payment of the amounts therein named. Second. Because the said commissioner finds the said debts as described in said trust deed to said J. S. Spencer, trustee, are a first lien upon the real estate of said corporation, by virtue of said trust deed, bearing date December 8, 1893; whereas

the said commissioner should have reported from all the evidence taken before him, and from the bill and exhibits filed therewith of the plaintiffs themselves, that said corporation was wholly insolvent, and unable to carry on its business further on account of its insolvency at the time of the execution of said trust to J. S. Spencer, trustee; and that, also, the said David Roush and S. J. Grimm were stockholders and members of the board of directors of said corporation at the time said trust was executed, and were present at the meeting of said board at the time it was ordered that said trust deed should be executed, and, as such directors, they held the property of said insolvent corporation in trust for the benefit of all its creditors; and that, for the foregoing reasons, the preference attempted to be given by said corporation to the said Roush, Weigand, and Grimm of the debt described in the said trust is not fair and reasonable to the other creditors of said corporation, and is illegal and void.   Third. Because the said commissioner fails to report when said Alliance Supply Company became insolvent, as required by the fifth requirement of the decree of reference in this cause, and instead only reports it as his belief that said company was insolvent on the 13th day of December, 1893; whereas said commissioner should have reported a finding either that said company was solvent or that it was insolvent at a time stated. Fourth.   Because said commissioner fails to find said corporation insolvent, and appears to find it solvent on December 6, 1893, at the time said notes and accounts described in Exhibit G, filed with plaintiffs' bill, were assigned to said David Roush, S. J. Grimm, and Adam Weigand and to said David Roush, as collateral security for the payment of the $1,300 and $350 notes, respectively." The defendants Henking, Bovie & Co., Slingluff, Johns & Co., and Tregellas, Hartel & Co. excepted to said report : "(1) Because the said commissioner fails to find the Alliance Supply Company insolvent; (2) because he fails to find the amount paid out by said Alliance Supply Company, and to whom paid, after said company became insolvent; (3) because said commissioner allows to the trustee and receiver exorbitant charges, fees, and commissions; (4) because the finding of said commissioner is not warranted by the

evidence; (5) because the amount allowed for taking the depositions before the commissioner is exorbitant." Plaintiffs Adam Weigand, David Roush, and S. J. Grimm excepted to the report "because the said commissioner fails to find trust deeds (Exhibits E and F) filed with plaintiffs' bill as valid and subsisting liens upon the real estate of said Alliance Supply Company; because the said commissioner finds the said Alliance Supply Company insolvent on the 13th day of December, 1893." J. S. Spencer excepted to the report because it failed to find the account of J. S. Spencer a lien upon the personal estate of the Alliance Supply Company. And the plaintiffs excepted to the report so far as it fixed the value of the outstanding accounts at fifty cents on the dollar.

On the 14th day of February, 1895, the cause came on to be further heard on the papers formerly read, orders made, and proceedings had, and upon the report of Commissioner John E. Bellar, and upon the evidence returned with said report, and the exceptions indorsed upon said report; and the court overruled each and every exception so indorsed, except that indorsed by J. S. Spencer, which was sustained, and modified the report in that respect, so as to make Spencer's account of seventy dollars a lien upon the fund in the hands of the receiver, and approved and confirmed the said report as so modified; and proceeding to ascertain and determine the indebtedness of the said Alliance Supply Company, and to ascertain and determine the liens and their priorities, as shown by the said report of the commissioner, the court convened the creditors and their amount of claims, with interest on each claim from the 3d day of September, 1894, until paid, and further ascertained that the debts of Adam Weigand, S. J. Grimm, and David Roush, and the debt of the said David Roush, were liens, and the only liens, upon the real estate of the defendant company, and were entitled to be paid *pro rata* out of the proceeds of the sale of the real estate; and in case the proceeds arising from the sale of the real estate, after paying the costs of sale, were insufficient for the payment in full of the said debts of Adam Weigand, S. J. Grimm, and David Roush, and the debt of David Roush, then, as to the residue of their said debts so remaining unpaid, they

should be entitled to their *pro rata* in the distribution of all the assets of the said Alliance Supply Company that might remain after the payment of the costs of suit and the lien debt of said J. S. Spencer; and, further, that the debt of Spencer was a lien, and the only lien, upon the funds in the hands of the receiver, and was entitled to be first paid out of said fund; and, further, that the debts of the remaining creditors of the said company so ascertained should, together with the unpaid residue, if any, of the debts of Weigand, Grimm, and Roush, be paid *pro rata* out of the assets of the said company then in, or thereafter to come into, the hands of said receiver, and remaining after the payment by the said receiver of the costs of the suit and the lien debt of Spencer; and that, if anything should remain after the payment of all costs and indebtedness, the same should constitute a fund for distribution among the stockholders; and proceeded to decree the sale of the property, and appointed commissioners for that purpose; and, further, that evidence taken in the suit showed sufficient cause for the dissolution of the said Alliance Supply Company; and decreed such dissolution thereof.

The first assignment of appellants is that the court erred in overruling the demurrer to plaintiffs' bill. This suit was brought under section 57, chapter 53, of the Code of 1891, which provides that, "If not less than one-third in interest of the stockholders of a corporation desire to wind up its affairs, they may apply by bill in chancery to the circuit court of the county in which the principal office or place of business of such corporation is situated,  *  *  * setting forth in their bill the grounds of their application, and the court may thereupon proceed according to the principles and usages of equity to hear the matter, and if a sufficient cause therefor be shown, to decree a dissolution of the corporation, and make such orders and decrees, and award such injunctions in the case as justice and equity may require." It is contended by the appellants that plaintiffs had no right to go into a court of equity to dissolve the corporation when a majority of the stockholders had the absolute right by vote to discontinue the business, which they had practically done, as shown by the bill itself; that it was virtually dissolved, being wholly and totally in-

solvent. "A corporation is not dissolved by the fact that it has lost or conveyed all its assets away, nor by the sequestration of its property, for the possession of property is not essential to corporate existence." 2 Beach, Priv. Corp. § 782, and authorities there cited. The statute provides two ways in which a corporation may be dissolved. One is under section 56, providing that the stockholders may at any time, in general meeting, resolve to discontinue the business of the corporation, a majority of the capital stock being represented, and voted in favor of such discontinuance, and may divide the property and assets that may remain after paying all debts and liabilities of the corporation. The other mode is as provided in section 57, as above cited, where not less than one-third in interest may file their bill for the purpose, and, on showing sufficient cause, the court will dissolve it. In this case, the directors, on the 13th of December, 1893, held a meeting, made an assignment of all its property, abandoned its business, and ordered the calling of a general meeting of stockholders after such assignment, to be held on the 14th day of January, 1894, which meeting of stockholders was held in pursuance of such notice, and ratified the assignments of the accounts, the deed of trust on the real estate to secure Weigand, Roush, and Grimm, dated the 8th December, and the general assignment, made the 13th December, but made no order in regard to the dissolution of the corporation. Plaintiffs then filed their bill for the dissolution. 2 Beach, Priv. Corp. §§ 782–784; 2 Mor. Priv. Corp. § 1026; 5 Thomp. Corp. § 6618; *Hurst* v. *Coe*, 30 W. Va., 158, (3 S. E. 564).

The second assignment is that the court erred in appointing the receiver, and transferring the funds in the hands of the trustee into the hands of the receiver, the same person named as trustee being appointed such receiver. The appointment of a receiver is largely a discretionary power possessed by courts of equity. Section 6823, 5 Thomp. Corp., says: "Unless there is a statute giving the right to a receiver in a given state of facts, no one can demand the appointment of a receiver *ex debito justitiæ;* but the question whether or not a receiver will be appointed in a given case is addressed to the sound discre-

tion of the chancellor, under all the circumstances. The discretionary power possessed by courts of equity of appointing receivers or refusing applications for such appointment will not be interfered with on appeal except in cases where the discretion has been manifestly abused; this being the general rule as to the appellate review of discretionary action." Section 58, chapter 53, of the Code, provides for the appointment of a receiver upon sufficient cause, when the corporation expires or is dissolved, or before its expiration or dissolution, on the application of a creditor or stockholder. In this case the trustee was invested with power to sell the property, and collect claims due the company, and had no further control over the real estate than to sell the same, which was previously incumbered with the several trust deeds attempted to be placed upon it by the board of directors, to secure some of their own members, and an accounting between the trust creditors and the company was necessary to be had to ascertain their claims, as well as the question of the validity of the trust deed on the real estate; and it was proper that a receiver should be appointed to take charge of the real estate until such matters could be adjudicated. The question of notice required by the statute (section 28, chapter 133, Code 1891) for the appointment of a receiver of real estate, or of rents, issues, and profits arising here, is met by the fact that the bill prays for the appointment of a special receiver; and the only parties who could complain or be affected by it were in court, contesting the right to appoint a receiver; and, under all the circumstances of the case, it was proper to appoint the trustee receiver.

The third assignment is: "The court erred in overruling the exceptions of appellants to the report of the master commissioner." The commissioner filed with his report depositions covering two hundred and twenty pages of the printed record, which included the depositions of quite all the members of the company who had anything to do with its management; and it is apparent from the testimony of all the witnesses who speak of the management that the business of the company was carried on in a very loose and unbusinesslike manner. W. A. Carson, secretary, and a member of the board of directors of the company, in

answer to a question whether, at the time the claims were turned over to Weigand, Roush, and Grimm as collateral (6th of December, 1893), they did not know that the company was insolvent, says: "I could not say that we absolutely knew it. We had a pretty good idea. That was before. We hadn't made an invoice to know how we stood," —and said that Grimm, Roush, and Weigand, the parties secured by the several deeds of trust, insisted upon the board turning over these claims and securing them. He further says: "We settled on the 6th day of December. Our object was to settle up all these differences with regard to the forfeiture of all bonds; but we expected, and it was the understanding and intention of the board of directors, that Nease make this settlement. We knew we were going to make the assignment, or thought so, several days beforehand. We did not want to have any trouble about the matter. We wanted to settle it in such a way that all would be settled, except his final report to the company." Witness Carson states that the first resolution passed by the board of directors providing for a mortgage or deed of trust to secure Grimm, Roush, and Weigand was on the 1st of April, 1893. Similar resolutions were entered afterwards on the 3d day of April, 1893, and the 27th day of May, 1893, and July 21, 1893. The first deed of trust was dated on the 1st day of September, 1893, and not made in the name of the corporation, but in the name of the individual directors, and acknowledged by them. The next was made on the 9th day of November, 1893, purporting to be a deed between the Alliance Supply Company, party of the first part, and Levi Roush, trustee, party of the second part, and signed, not by the company, but by B. F. Ridenour, president, and W. A. Carson, secretary. On the 6th of December, 1893, the board of directors passed a resolution reciting that inasmuch as the the several deeds of trust theretofore ordered to be executed by the stockholders and the board of directors of this company, for the purpose of securing S. J. Grimm, David Roush, and Adam Weigand certain indebtedness to them by the company, having been informally and perhaps defectively executed, it is the sense of the board that B. F. Ridenour, president, and W. A. Carson, secretary, are au-

thorized, empowered, and directed to make, execute, acknowledge, seal and deliver for record, a deed of trust upon the real estate of the company, to secure said Grimm, Roush and Weigand the one thousand three hundred dollars note bearing date June 28, 1892, and to David Roush the three hundred and fifty dollars note, dated January 15, 1893, both payable one day after date respectively; and by the same resolution the board authorized the president and secretary to assign to the same parties, as collateral security, certain accounts and notes, a list of which are given in the resolution, and in which resolution the following is contained: "And it appearing from the resolution offered that S. J. Grimm and David Roush, members of the board, are interested therein otherwise than as stockholders, they forthwith retired from the board. Thereupon, in their absence, the resolution was considered, a vote taken, and the resolution adopted by the remaining members of the board, and ordered that the matters and things in said resolution required to be done should be done accordingly." In pursuance of the last-named resolution, on the 8th day December, 1893, the said corporation, by its president and secretary, executed a deed of trust on the corporation's real estate to J. S. Spencer, trustee, to secure said two notes of one thousand three hundred dollars and three hundred and fifty dollars.

J. T. Fisher testifies that he was elected one of the board of directors July 15, 1892, and was the same day made secretary, and served in that capacity until October, 1893, when Mr. Carson took his place; that the first order of the board made, directing mortgage to be given Grimm, Roush, and Weigand, was April 1, 1893; and the reason it was deferred so long was that they had no one to write up the mortgage, and the directors directed him to write it up or have it done, and it was deferred from time to time. He says the company got the money from these parties, and he was elected one of a board of commissioners to make an investigation of their condition, and that he thinks they had enough to pay their liabilities, but did not make a full report to the board of directors. From the general tenor of his testimony, he seemed to know very little about the condition of the corporation. G. M. Nease testified that

he was a stockholder and occupied the position of sales-
man and clerk from the 14th of November, 1892, to the
13th of December, 1893, and kept the books of the corpo-
ration; that on the 6th of December, 1893, in a meeting of
the board of directors, they called him up for a final set-
tlement, and settled up with him that night; and they did
not have money enough by them to pay him, and they paid
him seventy-five dollars in cash, and gave him an order on
Wilson McKinney for twenty-five dollars, and docked him
twenty-two dollars and ninety-five cents; that they claimed
he did not comply with the bond.   They said they were
getting ready for a final settlement; and he said, if they
were getting ready for a final settlement, who should he
give the key to, and they said,   "You keep the keys and
stay here until we make the assignment."   S. J. Grimm
testifies that he was a director from the first to the end;
that he was one of the agents to purchase goods with the
clerk part of the time, was on the building committee, and
was the business manager of the concern; that he, Adam
Weigand, and David Roush were the building committee
for building the house on the lot they purchased, Weigand
being treasurer.   He says:   "The company ordered one
thousand dollars borrowed at one time.   It was borrowed
from Ham Johnson.   Myself and Adam Weigand and
David Roush gave our notes for the money to Ham John-
son.   Three hundred dollars was paid into the company
by himself and David Roush, which we borrowed from
other parties.   I believe the $1,000 was borrowed on
the 28th of June, 1892, and the $300 soon after or just be-
fore; I disremember which.   It was borrowed to pay
for goods."   In answer to the question whether nearly all
the accounts that existed at the time of the assignment on
December 13, 1893, had not been made prior to October 2,
1893, he says:   "Principally; there was some few made
after that."   He was asked:   "Hadn't you discussed at
the meeting of December 6, 1893, or prior thereto, in
your meetings, the propriety of making an assignment?"
He says:   "I do not know but what we had at that meeting,
or some other meeting about that time."   S. J. Grimm's
brother says that after the 1st of April, 1893, he and C. C.
Sayre loaned the company one hundred and fifty dollars,

which was paid back, he believes, the 6th of December, by the sale of ties of the company to Sayre, and the one hundred and fifty dollars was paid in that way. David Roush, one of the plaintiffs, stated that he had been a director and treasurer part of the time of the company, and was a member of the building committee when the storehouse was built; that the committee tried to make a report as near as they could to the board of directors,—a kind of verbal report; says that, in settling with the clerks, they took their statements, and did not investigate the books at all; that he was appointed a committee at one time to inquire into the condition of the company financially. The question was asked: "Can you tell what the result of that investigation was?" "Well, we found it in a bad situation; found it deeply in debt. That was the first time, really, we found out how we stood, when we investigated the matter." "How did you make your investigation?" "Why, overhauling all the books and bills, and everything we could find to find out where we stood." "When was that investigation made?" "I do not know as I could tell; I guess August 1st, 1893." "The first intimation you had of the company's indebtedness was on November 7th, 1893, when you (the commissioner) made the report?" "When we made the first investigation above there?" "That was on November 7th, 1893?" "Yes, sir." "You found bills outstanding $3,139.93. Did that amount include your note of Roush, Weigand, and Grimm?" "No, sir; it didn't; that was just the bills." "Then your claim of $1,700 or $1,800 is in addition to the $3,139.93?" "Yes, sir." "Then, Mr. Roush, at the time this report was made, your company was not in condition to pay its debts? The assets of your company were insufficient to pay the debts of your company?" "Yes, sir." "Then, at no time after November 7, 1893, was the assets of the company sufficient to pay all of its indebtedness?" "No; it was not at that time. Hadn't money enough to pay our debts. If we could have sold our property,—all we had,—I believe we could pay up at that time. If we could sold our property, we could paid up at the first investigation. I don't believe we could have been behind at no time." "You would have had to have sold your property

at its face value, would you not?" "Yes, sir." "Now, on November 7th, 1893, will you state to the commissioner that all your property and assets would have paid all your debts?" "I think they would. That is my belief,—that we could have paid up if we could have sold at its value."

In response to the inquiry of the decree of reference, "when said Alliance Supply Company became insolvent, the amount paid out by said company after it became insolvent, to whom paid, and the amount thereof," *etc.*, the commissioner reports it as his opinion, from all the evidence taken before him, that the Alliance Supply Company never was insolvent, unless it was so on the 13th of December, 1893, the date of the trust deed to E. J. Summerville (the assignment): "and at this time it is not clear from the testimony that said company was insolvent, but believes it insolvent. Your commissioner therefore reports that said company did not pay out anything after it became insolvent." Then proceeds to give a list of the notes and accounts assigned to S. J. Grimm, David Roush, and A. Weigand, as collateral security for their notes of one thousand three hundred dollars and three hundred and fifty dollars. On the 6th of December, 1893, at a meeting of the board of directors, the question of a final settlement and assignment was discussed; and the condition of affairs was not materially changed between that time and the 13th of December, when the assignment was made. It is shown by the testimony of G. M. Nease that, between those dates, the concern took in thirty one dollars and seventy nine cents in cash, which was turned over to the assignee; and between those dates eleven dollars and thirty-nine cents was sold out of the store, and thirty one dollars and thirty-seven cents Mr. Roush took in the way of produce that was charged to him. According to report of a committee to ascertain the condition of the company on the 7th of November, 1893, the liabilities amounted to over four thousand five hundred dollars, while the assets turned over to the trustee on December 13th at full invoice price only amounted to four thousand two hundred and ninety-seven dollars and thirty-three cents including outstanding accounts of some one thousand five hundred dollars at their face value, which are shown

by the evidence to be worth not more than fifty cents on the dollar; and this included all the assets which existed on December 6th, except the accounts assigned to Grimm, Roush, and Weigand as collateral, which amounted in all to five hundred and ninety-four dollars and twenty-nine cents, of which the assignees collected and applied to their claims three hundred and forty-six dollars and ten cents, and the residue of the accounts, two hundred and forty-eight dollars and nineteen cents in amount, were returned to the receiver by the assignees thereof.  Very evidently, as early as the summer of 1893 the directors had serious apprehensions of the safety of the company, as we learn from David Roush that orders were given to the clerk "to just buy a small amount of groceries," *etc.*, but that he had afterwards bought a big bill of goods,—one bill of four hundred dollars, he thinks, in August, probably between August and October; that he bought more than he was authorized to buy.  Mr. Roush says when asked, "What was the condition of the company in December, 1893, on the 13th day, in a general way, with reference to its general condition in August?  Was there any great difference as to the sufficiency of its property to pay its debts at those times?"  "The debts were growing more, and the stock was run down at that time."  The directors who were the largest creditors of the company, naturally felt anxious in the matter of security, as they examined more and more into the condition of affairs.  Their records and testimony show that their investigations began about August, 1893; and early in November they were not only pressing for a deed of trust on the real estate, but soon began to insist on having an assignment as additional security to them, by the company, of some of the outstanding accounts and notes, which assignment of such accounts and notes was made on the 6th day of December, 1893. This assignment was made on the same day that the question of a general assignment for the benefit of the creditors was discussed by the board, when Nease, their clerk, says:  "They said they were getting ready for a final settlement, and I said, 'If we are getting ready for a final settlement, who will I give the keys to?' and they said, 'You keep the keys and stay here, as you have, until we

make the assignment.'"    The stock of good when the general assignment was made, December 13, 1893, invoiced, at the prices fixed, two thousand and six dollars.    There is no reason to believe that Summerville, the assignee, did not do with the goods the very best that could be done with them to make the most money out of them possible; and yet he realized only the sum of one thousand two hundred and thirteen dollars and twenty-three cents from the sale thereof, as shown by commissioner's report in settling said trustee's accounts.    It is attempted to be shown by S. J. Grimm that the company assets on December 8, 1893, were sufficient to pay its liabilities on that date, when he considered the goods on hand worth two thousand five hundred dollars, the real estate worth one thousand two hundred dollars, and the outstanding collections something like one thousand five hundred dollars and it owed something like two thousand nine hundred dollars for goods, and one thousand eight hundred dollars or one thousand nine hundred dollars for borrowed money; when in fact the goods, five days afterwards (and it is shown that only a few dollars' worth were disposed of in the meantime,) only invoiced two thousand and six dollars and the outstanding accounts are shown to have been worth not more than fifty cents on the dollar.    The real estate only proved to be worth nine hundred and fifty dollars when sold, while the indebtedness was shown to be more than four thousand five hundred dollars.

There is no doubt in my mind, from the testimony in the cause, as to the insolvency of the company for the last three or four months of the year 1893; and while the directors claim that its assets were sufficient to pay its debts, and so stated, they had no careful estimates and inventories on which to base such statements, and their conclusions were rough estimates, if not mere guesses; and from the time they began to make something of an investigation, about August, 1893, they were evidently greatly concerned as to the safety of their claims, and doubted the solvency of the concern.    "A person is insolvent, within the meaning of section 2, chapter 74, Code 1891, when all his property is not sufficient to pay all his debts."    *Wolf* v. *McGugin,* 37 W. Va., 552, Syl., point 1, (16 S. E. 797.)    In the

case cited, the question of insolvency is well discussed. I deem it unnecessary to discuss it here.    The court erred in overruling exceptions to Commissioner Bellar's report, because he failed to find the Alliance Supply Company insolvent on the 8th of December, 1893, at the time said corporation executed the deed of trust to J. S. Spencer, trustee, to secure Roush, Grimm, and Weigand in the payment of their claims; and because he reported the said debts or claims as liens on the real estate by virtue of said deed of trust; and because he failed to find said corporation insolvent, and appeared to find it solvent on December 6, 1893, at the time the notes and accounts were assigned to David Roush, S. J. Grimm and A. Weigand as collateral security for the payment of their notes of one thousand three hundred dollars and three hundred and fifty dollars respectively; and because he failed to find the amount paid out by said Alliance Supply Company, and to whom paid after said company became insolvent.    I am aware that in *Moore* v. *Ligon*, 30 W. Va., 146, (3 S. E. 572,) the court holds "that, where questions purely of fact are referred to a commissioner to be reported on, his findings will be given great weight, and should be sustained, unless it plainly appears that they are not warranted by any reasonable view of the evidence; and this rule operates with peculiar force in an appellate court, when the findings of the commissioner have been approved and sustained by the decree of the inferior court,"—and cases there cited.    *Handy* v. *Scott*, 26 W. Va., 710; *Boyd* v. *Gunnison*, 14 W. Va., 1; *Graham* v. *Graham*, 21 W. Va., 698.    No disinterested, careful business man can read the whole evidence taken in this cause, and conclude that the assets would at any time after August, 1893, have been sufficient to pay off the indebtedness of the company.    It plainly appears to my mind that the findings of the commissioner on the question of insolvency are not warranted by any reasonable view of the evidence, and should not be sustained.    The trust deed dated December 8, 1893, to J. S. Spencer, must under section 2, chapter 74, Code 1891, be held to be made for the benefit of all the creditors of said company.

The exception to the report of the commissioner in not finding the assignment of claims to Grimm, Roush and

Weigand as collateral for the security of their debts to be fraudulent and void because of the insolvency of the company on the 6th day of December, 1893, at the time of the assignment, was, under the last clause of sec. 2, ch. 74 of the Code properly overruled.

It is assigned as error that the court erred in overruling the exception to commissioner's report, in allowing the trustee and receiver exorbitant charges, fees, and commissions, and in the amount allowed for taking depositions before the commissioner, as exorbitant. From the additional record brought up in *certiorari* in the cause, it appears there is charged one item of one hundred and seventy-nine dollars, as follows:   "Statement of costs of E. J. Summerville, in taking depositions in the case of Adam Weigand and and Others v. The Alliance Supply Company and Others:

To reporting six days before John E. Bellar, commissioner, at $10 per day ............... .. $ 60 00
To transcribing 237 pages, at the rate of 20 cents per hundred words, as allowed by sec. 4, pages 1062-3 (App.,) of Code [1891]    118 50
To certificate........................................................    50
_____
$179.00

"Approved:   F. A. Guthrie, Judge Circuit Court, Mason County, W. Va."

The statute under which this charge is attempted to be made is found on pages 1062, 1063 (Append.), Code 1891. The first section is as follows:   "The judges of the circuit courts may, at their discretion, employ shorthand reporters to report, under such regulations as the judges may prescribe, the proceedings had, and the testimony given, during the trial of any cause in said circuit courts, and may allow them a reasonable compensation for their services and expenses."   The second section prescribes how such compensation shall be paid in felony and misdemeanor cases, as well as in civil cases.   The fourth section provides that "it shall be the duty of said shorthand reporter to furnish a copy of the notes of testimony, written out in longhand, upon the request of the judge, without extra charge, and in case either party to the cause shall request or require a transcript of the said notes, the stenographer shall furnish the same in longhand, and

shall be entitled to be paid therefor the sum of 20 cents per hundred words so transcribed." Section 5: "The provisions of sections three and four shall apply to evidence heretofore taken by stenographers in cases in circuit courts where such stenographers were employed by such courts and duly qualified." Not until very recent years have the statutes of our State provided for stenographic reporters in the circuit courts, The system has been introduced very gradually, the legislature from time to time extending the authority to judges of particular circuits to employ stenographers, until the law was made general at the session of the legislature of 1887, when it was enacted as it now stands. The law only contemplates the employment of stenographers on the trial of causes in court, "to report under such regulations as the judges may prescribe, the proceedings had and testimony given during the trial of any cause in said circuit courts." And it is made discretionary with the judges whether they shall be employed in any given case. There is no authority given under the statute, and no such discretion given the circuit courts or the judges thereof, as to authorize the employment of a shorthand reporter before a commissioner in executing an order or decree of reference. The statute (section 5, chapter 137, Code 1891) prescribes the compensation to a commissioner for executing an order or decree of reference, and provides that "a commissioner returning a report shall annex thereto a certificate, under oath, that he was actually and necessarily employed for a number of hours, to be stated therein, in performing the services in which the fees stated at the foot thereof are charged. Until such certificate is made, no such fees shall be allowed or paid,"—and then goes on to provide for the protection of the commissioner in the security of his fees. I see no provision anywhere in the statute for an assistant or amanuensis to the commissioner; and, where a report of a commissioner is returned, it is the duty of the court, if called to its attention, to see that the certificate under oath of the fees and time employed of the commissioner, as required by said section 5, chapter 137, is annexed thereto, and, if not, that no fees shall be allowed or paid until it is supplied.

In considering the exception to the allowance to the trustee and receiver, I see nothing to complain of, except the item of one hundred and fifty dollars to the trustee over and above his commissions, which seems to have been an arbitrary amount to the trustee charged in the settlement of his accounts before the commissioner and reported by him, "By paid E. J. Summerville, trustee, for compensation as per deed to said trustee, $150." By reference to the trust deed this provision appears, "And it is also covenanted and agreed by and between the parties hereto, that said trustee is hereby authorized to employ counsel, and pay therefor a reasonable compensation, the amount so paid to be treated and considered as part of the expenses attending the execution of this trust; and it is also further covenanted and agreed that in addition to the commissions allowed by law in cases of sale under trust deeds, the said trustee shall also be allowed such other and further compensation as may be reasonable and just." Under this provision is charged and allowed an extra charge of one hundred and fifty dollars, and not a syllable of of evidence given, or anything offered to prove any extraordinary services rendered to entitle him to more than the reasonable compensation allowed by statute. In plaintiffs' bill the following allegation is contained: "And the plaintiffs further say that it would be greatly to the interest of all parties concerned, or in anywise interested in the assets of the said corporation, that E. J. Summerville, trustee, as aforesaid be appointed as such receiver, and that his compensation as such receiver shall be determined by services rendered as such receiver, and shall in no wise interfere with or conflict with the compensation to which he may already be entitled as such trustee." Just what this may mean, or what may be the purpose is not clear, but taking it all together, considering the extra allowance of one hundred and fifty dollars as trustee under the deed, the allowance of one hundred and seventy-nine dollars to the same person for reporting as stenographer taking depositions, and the particular care for him by plaintiffs in their bill, it naturally raises the question in one's mind, was this in reality an assignment for the benefit of the creditors of this insolvent corporation? In *Crumlish* v. *Shenandoah Valley R. R. Co.*,

40 W. Va., 627, Syl. pt. 6. "There is no fixed rule in this State as to the mode of allowing compensation to a special receiver, whether by way of commission or a fixed sum. Usually when the fund is large a lump sum is proper. The amount and mode of allowance are within the sound discretion of the court, under the circumstances of the particular case, subject to review on appeal." Extra allowances should not be made to trustees and receivers in the absence of evidence of extraordinary services, rendering such allowances just and reasonable. The courts recognize as a growing evil, "the practice of allowing, to trustees, complainants and receivers and their counsel, large and extravagant counsel fees and commissions payable out of trust funds under the control of the court." *Crumlish* v. *Shenandoah Valley R. R. Co.*, pt. 15, *supra.* This subject has received very marked attention at the hands of this Court in the case last cited, and to its discussion there I would call special attention. The Supreme Court of the United States condemns the practice, as is there shown, and it should receive the disapproval of all courts of equity.

Fourth assignment: "The court erred in sustaining the exception to commissioner's report by J. S. Spencer, and allowing him a lien upon the funds in the hands of the receiver for his account of $70, for services rendered the company." The exception as to the last three items, of ten dollars each,—in all, thirty dollars,—for services rendered in the preparation of the general assignment, was properly sustained; and the same should be paid out of the funds in the hands of the receiver, the services having been rendered for the benefit of all the creditors, and his charges being reasonable. "Where a fund is brought into a court of equity through the services of an attorney, who looks to that alone for his compensation, although his interest cannot technically be called a 'lien,' he is regarded as the equitable owner of the fund to the extent of the reasonable value of his services; and the court administering the fund will intervene for his protection, and award him a reasonable compensation, to be paid out of it." 3 Am. & Eng. Enc. Law, 458, and cases there cited. As to the residue of said claim of Spencer (forty dollars), the exception

to commissioner's report should have been overruled, as it was for services rendered the company, not in the interest of or for the benefit of all the creditors, and said residue of forty dollars should be classed with the general creditors.

For the reasons herein contained, there is error in the decree complained of, of February 14, 1895; and the same is reversed and annulled, and the cause is remanded for further proceedings to be had therein, according to the principles herein stated.

*Reversed.*