# CHARLESTON.

C. E. MAHAN, *Admr., et al. v.* BANK OF PAX *et als.*

(No. 6605)

Submitted October 21, 1930. Decided October 28, 1930.

*Dillon, Mahan & Holt,* for appellees.
*File, Goldsmith & Scherer,* for appellants.

LIVELY, PRESIDENT:

Appellants, on August 2, 1929, moved the circuit court to annul that part of a decree entered May 20, 1929, which directed that the general costs of the suit be paid out of the proceeds of sale of the real estate, except the costs of the sale of such real estate. The motion was overruled on the ground that the decree of May 20th was final, and this appeal is prosecuted from that refusal.

The object of the bill filed by the administrators of C. F. Lyda, with the will annexed, is to discover assets of the estate, preserve and marshall the same, ascertain indebtedness, sell the real and personal estate for the payment of debts, and settle the administrator's accounts; in short, to wind up the affairs of the estate which is alleged to be insolvent. A large

number of creditors and alleged debtors, about one hundred in number, were made parties defendant, among whom were appellants, W. R. Gray and Rosa F. Bailey, guardian of Gretchen Bailey Lykins.

Gray's debt of $3500.00 was secured by a deed of trust to C. E. Mahan, Trustee, executed by Lyda, October 17, 1925, on Lot No. 16, in the city of Mount Hope; and Rosa F. Bailey's debt, as guardian of Gretchen Bailey Lykins, for $4,500.00, was also secured by trust deed to the same trustee, dated January 4, 1926, on Lot 141 of Mount Hope Land Addition. There was no controversy concerning the amounts of these debts or their securities.

Many answers, cross-bills and demurrers were filed by various other persons and corporations; the cause was referred to Master Commissioner R. J. Thrift; and depositions of numerous persons taken. The master commissioner filed a partial report on May 1st, 1928, in which he reported unpaid taxes as first liens on said Lot No. 16 and 141, and as second lien on Lot 141, the trust deed debt of Rosa F. Bailey, guardian, amounting to $5,186.67; and as second lien on Lot 16, Gray's trust deed debt of $3,659.95. His final comprehensive and voluminous report, covering 106 printed pages of the record, was filed August 4, 1928, and deals with numerous claims for and against the estate. The stenographic costs of taking depositions before the master commissioner amounted to about $300.00. The master commissioner's allowance was fixed at $1,500.00, and the attorneys for the administrators were allowed $650.00 for their services. Many exceptions were made to the final report of the master commissioner by various persons, and by the administrators, and on May 20, 1929, the cause came on for hearing upon all the pleadings, evidence, etc., and especially upon this final report. The exceptions were overruled and the reports (partial and final) were ratified and confirmed, and judgments rendered to persons named in the report, with priorities as therein set out. The report, confirmed by the decree, found that the administrators had collected of Lyda's personal estate, $7,531.80, and had paid out $7,519.66, leaving a balance in their hands of $12.14. The decree directed a sale of the real estate by a commissioner, and

certain unsold personal property, and out of the proceeds to pay the costs of the suit, including $1,500.00 to the master commissioner, and $650.00 to attorneys for the administrators. By decree of June 21, 1929, it was ascertained that certain administration charges, namely, office rent of $80.00, telephone $43.53, audit of the estate by special auditor (E. J. Grace & Co.) employed by administrators $870.76, administrators' commissions of $176.59, and funeral expenses of $1,100.00 should be paid next after the taxes, and deeds of trust lien on the real estate.

The special commissioner made sale under the decree of May 20th, and reported that Lot No. 16 (on which Gray had deed of trust for $3,659.95, interest included), sold for $4,300.00 cash; that Lot 141 (on which Rosa F. Bailey had trust deed for $5,186.67, interest added), sold for $2,000.00 cash to Gretchen Bailey Lykins; that certain other interests in real estate sold for $55.00 cash, and the personal property (certain shares of stocks) sold for $40.00. His report came on to be heard on August 2, 1929, and was confirmed. Whereupon, appellants, having given notice, made the motion to vacate so much of the decree of May 20, which directed the payment of costs out of the proceeds of the real estate on which they had liens, which motion was overruled, and from which ruling this appeal is prosecuted. The estate was badly insolvent. The amount collected from the personal estate amounted to $7,531.80, and there was paid out pending the suit $7,519.66, leaving a net balance of $12.14 to pay costs of suit and creditors from the personal estate. To this sum should be added the sale of stocks, amounting to $40.00, the costs remaining unpaid when the decree of May 20th was entered amounted to about $2,500.00, not including the funeral expenses of $1,100.00, and the other items above set out in the decree of June 21st, all amounting to $2,094.09.

Appellants' aggregate debts secured by trust deeds on Lots 141 and 16, including interest to date of master commissioner's report, amount to $8,846.62. These two lots were sold for $6,300.00, out of which the costs of sale must be taken. If the costs of the suit, approximately $2,500.00, remaining unpaid, are to be paid out of this $6,300.00, as the decree of May 20th

directs, before appellants' liens, they will receive less than $3,800.00 on their aggregate debts of $8,846.62. This is the cause of their complaint. The concrete question here involved is whether a trust deed lienor whose debt and lien are in no way questioned and not thus involved in the litigation, can be made to pay costs of litigation incurred in the settlement of the estate of the insolvent debtor.

Collateral to the question involved is criticism of certain items of costs, namely, charges incurred by the administrators in the employment of an expert accountant amounting to $1,600.00, of which there has been paid about $729.24 out of the estate, the balance of $870.76, not involved here, as the decree of May 20, 1929, makes the latter sum payable after appellants' liens are paid; the master commissioner's allowance of $1,500.00 for taking evidence and making his report; and an allowance of $650.00 to the administrators for attorney fees to be paid to the law firm of Dillon, Mahan & Holt. When the administrators took charge, the estate was in a chaotic condition. It was extensive and diverse in character, and exceedingly complicated. Deceased had been engaged in a variety of businesses. Among other things, the audit showed an aggregate bank balance to Lyda of $1,191.15 in three banks, or a much larger sum if certain debts made by the banks were disallowed; accounts receivable of $40,724.43; notes receivable $83,801.63; equity in real estate above appellants' liens, amounting to $7,000.00; stocks and securities of $40,000.00, and some other smaller items of value. It showed notes payable amounting to $49,188.51, and contingent liabilities by endorsement by $349,415.92, and certain bank overdrafts. The trial chancellor has approved this administration charge, and from the entire record, evidencing the chaotic and uncertain condition of the estate, we perceive the necessity of expert help to aid the administrators, and cannot say that the chancellor has abused his discretion in the sum allowed and approved for that help. The master commissioner's fee is said to be exorbitant. The taking of this account ran over a period of about three years, and on its face shows expenditure of much time and labor. The commissioner did not comply with sec. 5, chap. 137, Code, which required him, in returning his report, to an-

nex a certificate thereto under oath that he was actually and necessarily employed for a number of hours to be stated therein in doing the work. The statute says that until such certificate is made, no such fees shall be allowed or paid. This defect was not called to the attention of the court when the decree of May 20, 1929, was entered, nor later. It is here brought to the attention of this court for the first time. We cannot say that the allowance is exorbitant. The defect may be corrected (if the commissioner sees fit to make the affidavit), under sec. 1, chap. 134, Code, after notice. Besides, the statute says that the fees shall not be allowed or *paid* until such certificate is made, and it becomes the duty of the court, when called to its attention, to see that the certificate under oath, as required by the statute, is annexed thereto, and that no fees be allowed or paid until that certificate is made. *Weigand* v. *Supply Co.,* 44 W. Va. 133. This court cannot say the commissioner's fees are exorbitant and unreasonable simply on the ground that the affidavit has not been made. We can only say that until that omission is called to the attention of the chancellor, and corrected, the fees should not be allowed or paid. That is a matter which can be conserved under sec. 1, chap. 134, Code. While it is not contended that the allowance to the administrators of attorneys' fees is excessive, it is urged that no such allowance should be made in this particular case in so far as appellants are concerned. The administrators and counsel to whom the fees are to be paid, by their brief, do not insist upon this allowance and practically waive their fees so allowed. This question, a troublesome one under this record, is thus eliminated. But eliminating allowance for counsel fees, there still remains unpaid costs of about $1,900.00, which are directed to be first paid by the decree of May 20th out of the proceeds of the real estate on which appellants have specific prior liens. This brings us to the controlling legal question involved and above stated.

Appellees insist that inasmuch as the estate was complicated, the administrators had the right to invoke the aid of the court in the settlement of the estate, involving, as it did, many legal questions and many conflicting claims; and equity having taken jurisdiction to sell the real estate, whether charged with

liens or not, the taxation of general costs of the suit were within the sound discretion of the court and not reversible upon appeal. It cannot be questioned that in a suit to wind up an estate, the personal property being insufficient to pay the debts, real estate of the decedent may be sold. Under sec. 3, chap. 86, Code, real estate becomes an asset for the payment of a decedent's debts, and may be sold under decree of the court, whether encumbered with, or free from liens. *Shahan's Adm'r.* v. *Shahan's Heirs,* 48 W. Va. 477. And generally taxation of costs in a chancery suit is not appealable. But there are exceptions to the general rule, depending upon the discretionary power of the chancellor. *Nutter* v. *Brown,* 58 W. Va. 237; *Bank* v. *Coal Corporation,* 107 W. Va. 460. Here the costs which are taxed are made payable out of a particular fund, namely, the fund derived from the sale of the real estate. Generally, such decrees are reviewable. See the cases cited in *Nutter* v. *Brown, supra.* This appeal involves the right of the chancellor, not to award costs, but to direct payment of that award out of a particular fund.

First, we will consider the appeal of the infant (she may be now of age), Gretchen Bailey Lykins. The deed of trust executed by Lyda, dated January 4, 1926, to Mahan, Trustee, conveyed the legal title to Lot 141, to secure her note of $4,500.00. Lyda had only the equity of redemption and that is all that his estate had when he died. The equity of redemption passed into the hands of the administrators for payment of debts. It is true that they could sell the entire property, subject to the lien, or sell the equity of redemption for the payment of debts. *Shahan's Adm'r.* v. *Shahan's Heirs, supra.* But the procedure, the method of selling, should not be permitted to impair the lien, the obligation of the contract. Neither the amount of the debt nor the validity of the lien were questioned in the suit. The litigation and costs incurred were concerning entirely different matters. A mere statement shows that it would be inequitable to mulch the infant in general costs, and thus take her money to carry on litigation for the benefit of others. If she had received some benefit, or had attempted to do so by the litigation and failed, a different situation would have arisen, but her connection with the

suit was passive, and was brought about simply because the legal title was held in trust for her. In *Sumrall* v. *Vanarsdall's Adm'r.*, (Ky.) 111 S. W. 310, the Kentucky Supreme Court held that the costs of a settlement suit of an insolvent estate in which a mortgage lien was enforced could not be taken from the money derived from the sale of the mortgaged land so as to leave an amount insufficient to satisfy the mortgage. The same principle was applied in *Bank* v. *Louisville Bagging Co.*, 98 Ky. 371, 33 S. W. 101; and *Shepard* v. *Saltzman*, (Ore.) 54 Pac. 882. In the *Shepard* case, the statute authorized an executor to retain expenses of administration in preference to any claim or charge against the testator's estate, but it was held that the statute did not give him a lien for his expenses of administration prior to a mortgage on the testator's land, although the other property was not sufficient to pay such expenses. In other words, the court held that it was not the intention of the legislature to change the principle above set out. The court cited *Ryker* v. *Vawter*, 117 Ind. 425, 20 N. E. 294; and *Estate of Murray*, 18 Cal. 686, where similar statutes were so construed, remarking that the "justice of the rule is manifest." The rule adverted to is that the lien of the mortgage is not to be displaced by *costs of administration* of the estate. The court further said: "Indeed, a mortgage would be a thing of uncertain and precarious value if the costs and expenses of administration of the estates of deceased persons were advanced to a prior right of payment over a mortgage lien." The same principle was applied in *Lithauer* v. *Royle*, 17 N. J. Eq. 40, and in our own case of *Bank* v. *Coal Corporation*, 107 W. Va. 460.

We think the principle of these cases are applicable to the instant case, for it is manifest that it would be inequitable to take the infant's money to pay for litigation in which she was in no way concerned.

The same observations will apply to the appeal of Gray to a limited extent. It appears that he was a claimant against the estate for another debt of about $3,000.00, partially secured, and that he held numerous obligations on which the estate was

secondarily liable for the approximate sum of $100,000.00. To this extent, he was actively interested in the prosecution of the suit, and should bear his proportion of the costs and expenses in proportion to others similarly situated. It would be unjust to require him to pay the entire deficiency out of the fund coming to him from sale of the lot on which he had the trust lien.

The decree of May 20, 1929, which directs payment of the costs of suit out of the funds derived from the sale of said lots 16 and 141 will be reversed, and the cause remanded.

*Reversed and remanded.*